## GRAHAM et al. v. HOLLANDSWORTH DRILLING CO. et al.
### No. 5983.

Court of Civil Appeals of Texas. Texarkana.

March 10, 1943.

Rehearing Denied March 25, 1943.

Sam J. Dotson, Cecil Storey, and Perry R. Meredith, all of Longview, for appellants.

Ramey, Calhoun, Marsh & Sheehy, of Tyler, Scott & Hall, of Marshall, Renfro & Kilgore, of Dallas, and Ford & Frumer, of Kilgore, for appellees.

WILLIAMS, Justice.

A mineral deed, dated February 21, 1931, executed by Henry Graham, purports to convey to Mrs. A. G. Foster ½ the minerals under a 17½-acre tract out of the John Hanks Survey in Marion County. A mineral deed and an oil and gas lease, both dated December 11, 1933, executed by Henry purports to convey to Dr. Morris Velinsky an oil and gas lease covering the tract and the remaining ½ of the minerals. Henry died intestate in December 1937.

In this suit by appellants, Rachel Graham, the surviving wife, and Willie (Buck) Graham, the surviving child of Henry Graham, they sought to cancel above three conveyances so executed by Henry without the joinder of Rachel, his wife; for removal of cloud upon title, and for damages in the amount of oil produced from the premises. They also pleaded a trespass to try title action in statutory form. As grounds for cancellation, they alleged "that said land at the time of execution and delivery of above instruments constituted the homestead of Rachel and Henry, and that she not having joined with her husband in their execution, same were void."

The parties who were made defendants, appellees here, are the Hollandsworth Drilling Company which had acquired the ⅞ leasehold estate; and Dr. Velinsky, Mrs. Foster and others not necessary to name, the holders of various royalty interests. In addition to pleas of not guilty and general denial, some of the defendants also pleaded abandonment of the homestead by Rachel and abandonment of Henry Graham by Rachel prior to execution of the conveyances in controversy. Hollandsworth Drilling Company further pleaded that it had made valuable improvements in good faith.

The jury answered "No" to special issue No. 1, reading: "Do you find from a preponderance of the evidence that Henry Graham occupied and claimed the 17½ acres described in the pleadings, prior to the 21st day of February 1931, with the intention to establish it as a homestead for both himself and wife?" Issue No. 2 reads: "Do you find from a preponderance of the evidence that at the time of the execution of the mineral deed by Henry Graham to Mrs. A. G. Foster, dated February 21, 1931, that Rachel Graham had left her husband, voluntarily and without his fault, and had formed the intention not to return to and live with him?" Issue No. 3 contains the same wording as issue No. 2, but is directed to December 11, 1933, the date Henry executed the conveyances to Dr. Velinsky. Issues Nos. 2 and 3, were both answered "Yes." To issue No. 4, reading: "Do you find from a preponderance of the evidence that Rachel Graham has not used and occupied the land in controversy as her homestead since the death of Henry Graham?" the jury answered, "She has not."

Based upon above findings plaintiffs were denied any relief prayed for.

The court refused to give plaintiffs' special requested issues Nos. 2, 3 and 4. No. 3 reads: "Do you find from a preponderance of the evidence that Rachel and Henry Graham lived apart without cohabitation for a period of ten years prior to the 21st day of February 1931?" Nos. 2 and 4 were of the same wording, except as to dates, namely, December 11, 1933, and December 1937. Exceptions were taken that issues Nos. 2 and 3 as submitted by the court did not include a requirement that to constitute abandonment the spouses must have lived apart without cohabitation for a period of ten years.

The points which attack the failure to give above requested issues, the failure of the court to include above statutory ground for divorce in the issues submitted, and the refusal of the court to grant plaintiffs' motion for judgment non obstante veredicto are directed (a) to the sufficiency of the evidence to support any of the jury's findings; and (b) that the findings of the jury are insufficient to support the judgment rendered.

The tract involved was formerly a part of the 70-acre community homestead of Alex and Angeline Graham, the parents of Henry. Alex died in 1905 and Angeline in 1922, both intestate. In the partition of the estate in February 1931, Henry received as his share of the inheritance this 17½ acres. Shortly after the partition in 1931, according to Buck's testimony, and shortly after Angeline died in 1922, according to other evidence, Henry started building a house on the 17½ acres which at the time of Henry's death had never been completed. He built on it "just a little along at a time,"

"was a little shack 12 x 14 feet"; "could see through the roof from the road, lots of it and through the walls, too;" "bunch of old shingles nailed on its side, some weather-boarding"; "no ceiling." The foregoing was the only improvement placed on the tract. After Henry had started building the house (date not shown), he lived in it, being "in and out of it" (did not stay at home much), until his death in 1937. Henry lived there alone. Rachel never lived in the house or on the 17½-acre tract. Rachel never visited Henry on this place. She was living in Dallas at Henry's death and still resides there.

Henry and Rachel were married in 1889. Buck Graham was born in 1897. According to Buck, his mother, Rachel, left Marion County in 1914 or 1915 to reside in Dallas, Texas, with a daughter by a former marriage. From 1914–15 until the time of trial (1941), Rachel has lived in Dallas, except the times "she came down here or went to Kansas City." During that time "Rachel hadn't lived with Henry." According to Rachel, supported by other testimony, Henry lived in Texarkana for about fifteen years prior to the time she went to reside in Dallas, and had lived in Shreveport for about four years prior to the time he first went to Texarkana. Henry operated a tailor shop in Texarkana, and probably also in Shreveport. He was also a paper-hanger and a musician. From the time Henry first went to Shreveport until his death, approximately forty years, he never kept a house, whether rented alone or with somebody else, in which he and Rachel and Buck lived, and in this period Rachel never lived in a house that Henry called home. The record is without evidence of quarrels between them or of any wrongful conduct or harsh treatment by Henry toward Rachel at any time. There is testimony principally given by members of her family that during above period of time Henry and Rachel lived together three weeks when he was in Shreveport; a few days when he was in Texarkana; about two or three weeks in 1922 at Mac Graham's home; approximately a year at Ed Anderson's home in Harrison County, either in 1932–33 or 1933–34; Two weeks in June 1937 at Ed's home following Ed's death; and that every year after 1914 Rachel returned to East Texas to visit her children by a former marriage, and at such times Henry would visit her and they would spend the night or nights together.

A part of Buck's testimony supports above details of association, and then he testified that the time when she made her fourth trip until her son Ed got sick (1937) was somewhere in the neighborhood of fifteen or twenty years. Ennis Graham said that in 1935 they had been living apart for fifteen years.

The only contributions made by Henry for the support of Rachel during the forty years, as testified to, are as follows: Henry furnished Rachel some groceries and papered a room occupied by Rachel at Ed's house when she was sick there in 1933–34; "he sent a little money sometimes when he had it, and I sent him $5 one time." Rachel said she was sick with malaria when she went to Dallas, and her daughter furnished the funds for the trip there. After the first year in Dallas she was employed by white people, made good money and stayed there because, as she said, Henry was gone so much. While in Dallas she secured an old-age pension out of the Dallas offices. She did not attend Henry's funeral, stating that she didn't have the funds to make the trip.

Over objections of plaintiffs, acquaintances and neighbors were permitted to testify that Henry told them: "He and Rachel had been separated around 35 to 37 years"; "she lived in Dallas"; "he said she quit him and moved to Dallas"; "he said he used to have a wife"; "was living by himself and said he was going to keep on living by himself."

There is testimony by Rachel, her daughter, and a brother-in-law that Henry asked Rachel in 1934 to come out to his house and live with him, and she agreed to come when Henry got the house completed; that about the time of Ed's death, Henry said he was fixing a place for Rachel to live, and that Henry in 1933 refused to sell some lumber, stating that he was going to use it on the house, because "I want plenty of room for Rachel."

In Besch v. Besch, 27 Tex. 390, 392, the Supreme Court in discussing the character of evidence to be considered in support of abandonment as grounds for divorce under Sec. 3, Article 4629, R.C.S. of 1925, said: "As a general rule, the intention with which an act is done can only be ascertained by circumstantial evidence. The inward objects and purposes of the mind, when in violation of moral or legal duty, are more frequently and truly indicated by

circumstances, than by open and unequivocal acts or declarations."

Rachel's departure in 1914–15 for Dallas; her residence in Dallas until date of trial; her employment, earnings, pension money, and maintenance of a dwelling in Dallas; her failure through the years to visit her husband or the tract in controversy, but, on the contrary, to visit her children; her failure to attend his funeral; the testimony that Rachel said in 1934 she would return and live with Henry when he got the house completed; the testimony of her son that fifteen or twenty years elapsed between her fourth visit back to East Texas and Ed's death in 1937; the explanations given; and the contradictions in the testimony presented issues of fact for the jury, the judges of the credibility of the witnesses and the weight to be given their testimony. When the evidence here presented is weighed and governed by the rule that "only evidence which tends to support a * * * finding of fact may be considered and all evidence favorable to the opposite contention should be disregarded," 3 T.J. p. 1090, and authorities there cited, Cartwright v. Canode, 106 Tex. 502, 171 S.W. 696, such does not warrant the conclusion that the jury's findings Nos. 2 and 3 are without support in the evidence.

The affirmative findings by the jury to issues Nos. 2 and 3 each of which contained every factual element necessary to establish abandonment, namely, departure of the wife from the husband; the voluntary nature of such action; the absence of cause or wrongful conduct on the part of the husband; and the purpose or intention on the part of the wife not to return, will support the judgment entered here. Murphy v. Lewis, Tex.Civ.App., 198 S.W. 1059; Newland v. Holland, 45 Tex. 588, 589; Mann v. Wilson, 39 Tex.Civ.App. 111, 86 S.W. 1061, writ refused; Mabry v. Kennedy, 49 Tex.Civ.App. 45, 108 S.W. 176, writ refused; Miller v. Stine, Tex.Civ. App., 99 S.W.2d 397; 22 T.J. p. 135 Sec. 95; Dickerson v. Dickerson, Tex.Civ.App., 207 S.W. 941; 17 Am.Jur. p. 196 Sec. 93; 15 T.J. Sec. 47 p. 500; 1 Am.Jur. p. .6; 1 T.J. p. 10, Sec. 10.

Appellants contend that in the absence of jury findings in the affirmative that Henry and Rachel had lived apart without cohabiting for a period of ten years prior to the execution of the respective instruments in 1931 and 1933, and such a ground for divorce (Sec. 4, Article 4629, R.C.S.) not being included in the issues submitted or in explanatory charges, the jury's findings to issues Nos. 2 and 3 were insufficient to support the judgment entered. In support of above position, appellants cite and rely upon Schulz v. L. E. Whitham & Co., 119 Tex. 211, 27 S.W.2d 1093.

We do not think the decision is authority for holding that the matter inquired about in special issues Nos. 2 and 3 (abandonment) should have continued for a fixed period of at least three years or ten years, as would be required to support an action for divorce. Murphy v. Lewis, supra; Mann v. Wilson, supra; Mabry v. Kennedy, supra. The provisions of Article 4629, Sec. 4, though discussed, were not involved in the disposition of the Schulz case. The disposition of that appeal turned upon the conditions (not existent in the instant case) that the husband "recognized his moral and legal duty to her as his wife to support her, and the evidence shows that he was supporting her at the time, and continued to do so down to the time of the trial of this case." As stated in Miller v. Stine, supra [99 S.W.2d 400]: "If the Supreme Court had intended to announce a new and different principle of law, inconsistent with that which has so often been stated by the Court of Civil Appeals [above cases] with the sanction of that court, it naturally would have referred to such rule and the cases holding it."

The conclusions above reached render unnecessary a discussion of the evidence if same is sufficient to support the jury findings Nos. 1 and 4 or if either finding will support the judgment rendered.

The statements attributed to deceased, above set out, that they had been separated, that his wife had quit him and moved to Dallas, and that he was going to keep on living by himself, were admissible with respect to the matters involved in special issue No. 1. McCormick & Ray, Evidence, Sec. 405, p. 508.

The other points presented have been considered and are overruled.

The judgment will be affirmed.